IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| K&G CONTRACTING, INC. | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 23-1855 |
| | : | |
| WARFIGHTER FOCUSED | : | |
| LOGISTICS, INC., DARRELL M. | : | |
| KEM | | |

## MEMORANDUM

**KEARNEY, J.**                                                                    **August 30, 2023**

Experienced government contractors settled a complex breach of contract lawsuit through detailed agreements allowing another government contractor to step into the shoes of the allegedly defaulting contractor. The parties wanted to continue servicing their existing and future government contracts by replacing the defaulting contractor with a new (hopefully better) contractor. The parties included specific language confirming the disappointed contractor knew the new agreements superseded all earlier understandings. They dismissed the earlier case.

The new contractor then allegedly defaulted on its newly obtained service obligations to the disappointed contractor. So the same disappointed contractor now sues the new contractor for breach of the most recent agreements. But it also sues the new contractor and its owner for fraudulently inducing it to agree to a new servicing contract by misrepresenting the new contractor's ability to perform. The new contractor and its owner move to dismiss the fraud claim arguing the disappointed contractor agreed the new agreements superseded all earlier understandings and they cannot be liable for earlier (pre-contract) statements. The disappointed contractor attempts to get around its earlier representation. We find it cannot. We grant the new contractor's and its owner's partial motion to dismiss the disappointed contractor's fraudulent inducement claim against them. The parties will now proceed on the breach of contract claim.

I. **Alleged Facts**

K&G Contracting, Inc. performed services for government contractor Lynn Electronics, LLC for an unspecified period before August 1, 2022.[1] K&G identified government agencies interested in purchasing wire, cable, and other goods, prepared bids and proposals on Lynn's behalf, and negotiated government contracts for Lynn.[2] Lynn manufactured or purchased the ordered product under an awarded bid and then packaged and shipped it to the governmental agency.[3] K&G and Lynn agreed to split net profits (and losses) equally from all awarded contracts.[4]

K&G and Lynn later disagreed about their compensation structure. K&G sued Lynn (and other unidentified persons) for breach of contract and tort claims.[5] The parties decided to explore a business resolution. Lynn still needed to fulfill contracts with payment owed to K&G.[6] The parties agreed to bring in a new company, Warfighter Focused Logistics, Inc., after discussions with its owner Darrell M. Kem.

Warfighter owner Kem knew of 1,700 contracts already in existence and a comparable number of expected new contracts.[7] Mr. Kem represented Warfighter had the resources, experience, and ability to satisfy its obligations.[8] Mr. Kem made these representations knowing certain agencies already canceled 250 contracts with Warfighter because it could not fulfill them.[9] Mr. Kem made representations knowing they were false, knew Warfighter could not fulfill the contracts, and made the representations to induce K&G to allow it to take over Lynn's obligations and then await payment from Warfighter.[10] K&G do not identify representations other than by Mr. Kem which induced their willingness to sign contracts.

So K&G, Lynn, and Warfighter entered into separate contracts which would allow K&G and Lynn to settle their lawsuit and make sure someone competently managed these awarded but unpaid government contracts and future contracts: (1) an Asset Transfer Agreement among K&G,

Lynn, and Warfighter; (2) a Transition Services Agreement between Lynn and Warfighter; and (3) an Independent Representative Procurement Agreement between K&G and Warfighter.[11]

### *K&G, Lynn, and Warfighter sign an Asset Transfer Agreement.*

Lynn agreed, as detailed in the Asset Transfer Agreement, to transfer all government contracts already secured by K&G but unfulfilled by Lynn and for which K&G had yet to be paid to Warfighter.[12] They called them "Assumed Contracts." The parties identified 1,700 Assumed Contracts totaling $13.7 million in gross revenue transferred by Lynn to Warfighter. Warfighter assumed all of Lynn's obligations except for those contracts Lynn agreed to perform under the Transition Services Agreement.[13] Mr. Kem signed the Asset Transfer Agreement, the Transition Services Agreement, and the Independent Representative Procurement Agreement on behalf of Warfighter.

> The parties agreed to integration and non-reliance clauses in the Asset Transfer Agreement:
>
> Entire Agreement; Amendments. This Agreement, including the other Transaction Documents and all of the Schedules hereto, contains the entire understanding of the Parties and supersedes all prior agreements and understandings relating to the subject matter hereof. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties.[14]
>
> Acknowledgement of Non-Reliance. Except for those representations and warranties expressly set forth in Article II as made by [Lynn], each of K&G and [Warfighter] hereby disclaims reliance on any and all representations, warranties, or statements of any nature or kind, express or implied, including the accuracy or completeness of such representations, warranties, or statements. Each of K&G and [Warfighter] hereby waives any and all claims of any nature or kind arising from any alleged fraud, misrepresentation, omission, concealment, or breach of warranty except for claims for a misrepresentation expressly made, or a breach of warranty expressly set forth, in Article II.[15]

### *Lynn and Warfighter sign a Transition Services Agreement.*

Lynn needed to make sure someone satisfied its obligations on the government contracts and to K&G. So it reached a Transition Services Agreement with Warfighter requiring Lynn to

3

perform all its obligations of the Assumed Contracts for August 2022, including submitting purchase orders to suppliers, packaging inventory and shipping packages to government agencies, paying vendors, invoicing government agencies, processing payments from the government agencies, and paying a net amount to Warfighter.[16]

The roles slightly changed after August 2022. Lynn and Warfighter agreed, as confirmed in the Transition Services Agreement, for Lynn to perform, and to continue to perform, its obligations for the Assumed Contracts until September 1, 2022.[17] Warfighter agreed to be responsible for packaging inventory, printing labels, and shipment beginning on September, 1, 2022.[18] Lynn and Warfighter agreed, as confirmed in the Transition Services Agreement, Lynn must pay Warfighter all net profits from the Assumed Contracts and the Transition Services Agreement remains in effect until the government agency provides Lynn and Warfighter novation agreements for all Assumed Contracts.[19] No novation agreements have been provided to Lynn as yet.[20]

### *K&G and Warfighter sign the Independent Representative Procurement Agreement.*

Warfighter agreed to take over the role of Lynn in some part beginning in August 2022. K&G and Warfighter signed an Independent Representative Procurement Agreement with an initial term of five years.[21] The parties agreed to an integration clause:

> This Agreement contains the entire understanding of the parties with respect to the subject matter hereof and supersedes all prior or contemporaneous representations, warranties, agreements and understandings, and may not be amended nor may any provision hereof be waived except in writing signed by both parties.[22]

Like its agreement with Lynn, K&G's Independent Representative Procurement Agreement with Warfighter requires K&G to identify government agencies interested in purchasing wire, cable, and other goods, prepare bids and proposals on Warfighter's behalf, and negotiate with the government agency to secure awarded contracts for Warfighter.[23] Warfighter is

4

then obligated to manufacture or purchase, package, and ship to the agency all wire, cable, and other goods specified in the contracts. K&G and Warfighter split net profits (and losses) equally.[24] Warfighter agreed to pay K&G all net profits Warfighter receives from Lynn under the Transition Services Agreement for the Assumed Contracts less a packaging fee of 2.5 percent of the total contract price for each Assumed Contract.[25]

Warfighter also agreed to pay K&G three percent of its net profit on all other government contracts performed by Warfighter but not obtained through K&G's efforts.[26] And they agreed Warfighter must continue paying K&G for all government contracts existing at the time of termination secured because of a contact, contract, supplier, or information K&G provided to Warfighter.[27]

### *K&G obtained contracts but now sues Warfighter.*

K&G obtained more than 1,350 new government contracts ("New Contracts") from August 15, 2022 to April 24, 2023, totaling over $8.5 million in gross revenue, over $1.6 million in gross profit, and $844,486 in net profit.[28]

K&G now claims Warfighter failed to pay: (1) for services connected with any of the 1,700 Assumed Contracts and 1,350 New Contracts; and (2) the three percent of its net profit of any other government contract. K&G also claims government agencies cancelled over 250 Assumed and New Contracts because of Warfighter's failure to perform obligations under those contracts for a net loss of more than $250,000.[29]

K&G alleges Mr. Kem misrepresented Warfighter's experience and ability to satisfy its obligations for the Assumed and New Contracts when he knew Warfighter did not have the ability to do so.[30] K&G alleges Mr. Kem made these misrepresentations to mislead K&G and induce it to sign the Asset Transfer Agreement and the Independent Representative Procurement Agreement.[31]

K&G sued Warfighter for breach of the Asset Transfer Agreement, Independent Representative Procurement Agreement, and the Transition Services Agreement as a third-party beneficiary and sued Warfighter and Mr. Kem for fraudulent inducement. K&G also seeks declaratory judgment:

- if the Independent Representative Procurement Agreement terminates, Warfighter must continue to pay K&G for all existing and future government contracts whenever obtained as a direct or indirect result of K&G's efforts;

- Every three months, Warfighter must provide K&G with a list of all government contracts obtained during the preceding three months, the names of the suppliers, contracts, contractors, and any other individuals used or relied on by Warfighter to obtain the contracts; and

- Warfighter may not unreasonably hinder or prevent K&G from accessing or retrieving its inventory located in Warfighter's warehouses in Pennsylvania and Florida. K&G owns more than $1 million in inventory stored in Warfighter's warehouses in Florida and Pennsylvania and anticipates it will be locked out of the warehouses unable to retrieve its inventory.[32]

## II. Analysis

Warfighter and Mr. Kem move to dismiss K&G's fraudulent inducement claim, arguing: (1) the parol evidence rule bars the fraudulent inducement claim; (2) the gist of the action doctrine bars the fraudulent inducement claim; (3) as a matter of law, Mr. Kem is not liable for fraudulent inducement; and (4) failure to state a claim for fraud based on post-agreement developments.[33]

K&G agrees the parol evidence rule bars its claim Warfighter fraudulently induced it to enter the Independent Representative Procurement Agreement and should be dismissed.[34] But it contends Pennsylvania law allows it to proceed on its claims (a) Warfighter fraudulently induced it to enter the Asset Transfer Agreement, and (b) Mr. Kem fraudulently induced it to enter the Asset Transfer Agreement and the Independent Representative Procurement and is personally responsible under Pennsylvania's participation theory of liability.

6

### A. The fraud-insulating provision in the Asset Transfer Agreement defeats K&G's fraudulent inducement claim against Warfighter.

To state a fraud claim under Pennsylvania law, K&G must allege: (1) a misrepresentation or concealment; (2) material to the transaction at issue; (3) made with knowledge of its falsity or recklessness as to its truth or falsity (for a misrepresentation) or calculated to deceive (for a concealment); (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) resulting injury proximately caused by the reliance.[35] These elements apply to both fraudulent inducement and fraud in the execution.[36] A successful fraudulent inducement claim requires proof of the six elements and applies when a person under no duty to enter into a contract is deceived into doing so.[37]

Under Pennsylvania law, the parol evidence rule is a rule of contract law barring the use of extrinsic evidence to nullify, modify, or augment the terms of an integrated contract.[38] An integration clause in a contract typically states the contract contains the final expression of terms of the parties' agreement and supersedes all prior agreements on the subject matter.[39] "Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract."[40] There are four exceptions to the parol evidence rule: extrinsic evidence may be used to modify contract terms of (1) an integrated contract when it is ambiguous or (2) to add contract terms omitted by fraud in the execution, (3) by accident, or (4) by mistake.[41]

In the context of a fraud claim, the parol evidence rule alone does not bar extrinsic evidence to prove a pre-contractual misrepresentation or concealment to meet the elements of a fraudulent inducement claim.[42] This is because a party seeking to introduce extrinsic evidence is not trying to vary the terms of the contract, but to prove a pre-contractual misrepresentation or concealment.

7

But when a contract (like the one we review today) contains a "fraud-insulating" clause, we extend the parol evidence rule to bar the use of extrinsic evidence to vary the fraud-insulating term.[43] Without extrinsic evidence, "it is virtually impossible" to establish the justifiable reliance element of a fraud claim under Pennsylvania law.[44] Fraud-insulating clauses often contain "no-reliance" on another party's pre-contractual representations, the assumption of joint responsibility for pre-contractual representations, and provisions stating the representations in the contract either supersede all prior representations or are the only representations made.[45]

Several judges studied the effect of these contractual clauses on fraud claims over the past several months. Our Court of Appeals closely examined fraud-insulating provisions under Pennsylvania law in *SodexoMAGIC LLC v. Drexel University*. Food service vendor Sodexo sued Drexel University for fraud and breach of contract and Drexel responded with fraud and breach of contract counterclaims. The parties' agreement contained two clauses at issue:

> This Agreement contains all agreements of the parties with respect to matters covered herein, superseding any *prior agreements*, and may not be changed other than by an agreement in writing signed by the parties; and

> The financial terms set forth in this Agreement and other obligations assumed by SodexoMAGIC hereunder are based on conditions in existence on the date [it] commences operations, including by way of example [Drexel's] *student population*; labor, food and supply costs; and federal, state and local sales, use and excise tax. In addition, *each party has relied on representations* regarding existing and future conditions and *projections* made by the other in connection with the negotiation and execution of this Agreement.[46]

Sodexo alleged Drexel misrepresented projections of future student population. The District Judge dismissed the parties' fraudulent inducement claims at summary judgment based, in part, on the parol evidence rule.[47] Our Court of Appeals reversed, concluding the parties' contract contained an integration clause but lacked a fraud-insulating provision.[48] The court reasoned the integration clause referred to "prior *agreements*" only and failed to mention or disclaim "prior *representations*"—drawing a distinction between "agreements" and

8

"representations."[49] The court further reasoned the parties chose contractual language in one clause to include express reliance on *representations*, such as projected student population, but did not choose to use such language in the integration clause applying to "agreements." The court concluded the integration clause did not contain fraud-insulating language because it did not disclaim reliance on pre-contractual representations and did not state representations in the agreement are exclusive or supersede all prior representations.[50]

Our Court of Appeals later applied the reasoning *SodexoMAGIC* to affirm the dismissal of fraudulent inducement claims based on fraud-insulating provisions. In *Battle Born Munitions Inc. v. Dicks Sporting Goods*, our Court of Appeals affirmed Judge Wiegand's dismissal of a fraudulent inducement claim based on the parties' agreement with fraud-insulating and no-modification provisions:

> The Agreement *"supersedes all prior written and oral and all contemporaneous oral agreements and understandings* with respect to the subject matter thereof[,]" requiring *"any changes or modifications to or waivers of such terms and conditions must be in writing and signed by both* [parties]."[51]

The court concluded the parol evidence role coupled with the fraud-insulating and no-modification clauses barred the fraudulent inducement claim.[52] The court reasoned the parties' agreed chosen language their contract "supersedes all prior written and oral and all contemporaneous oral agreements and understandings with the respect to the subject matter thereof" and the no-modification clause "plainly indicates the parties' intent" their agreement is fraud insulating, as any later interactions between them were to be in a signed writing.[53]

Our Court of Appeals several weeks ago in *Kelly v. Peerstar LLC* concluded two clauses in the parties' contract constituted fraud-insulating clauses:

> The contract is the parties' *"entire agreement and understanding"* which *"supersede[d] all prior negotiations and/or agreements"* and the contract would "remain[ ] in effect

9

despite any ... discovery or existence of any new or additional fact, or any fact different from what either [p]arty now knows or believes to be true."[54]

The court affirmed Judge Gibson's grant of summary judgment of a fraudulent inducement counterclaim based on the fraud-insulating clauses. The court reasoned the clauses "resemble contractual language" Pennsylvania's appellate courts treat as fraud-insulating clauses and barred the use of extrinsic evidence to show justifiable reliance on alleged pre-contractual representations.[55]

Judge Slomsky recently applied our Court of Appeals' guidance in *SodexoMAGIC* to dismiss a fraudulent inducement claim in *Gordon v. Pasquarello*.[56] The parties' dispute in *Gordon* arose from business dealings memorialized in three agreements, two of which included integration clauses:

> This Agreement constitutes the complete and exclusive statement of the agreement among the Members. ***It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty***. This Agreement may not be amended without the written consent of Members holding at least fifty-one percent (51%) of the issued and outstanding Units.[57]

Judge Slomsky concluded this language constituted an integration clause with a fraud-insulating provision evidenced by the language the parties' agreement "supersedes all prior written and oral statements, including any prior representation ...."[58] Judge Slomsky dismissed the fraudulent inducement claims. But Judge Slomsky found the parties' third agreement, while containing an integration clause, did not include fraud-insulating language. The third agreement provided:

> This Agreement represents the entire limited liability company agreement of the Company within the meaning of the Act.[59]

Judge Slomsky explained this integration clause differed from the other two because it did not reference the parties' earlier representations.[60] Judge Slomsky concluded the language of this

10

clause did not "bar consideration of the prior representations made by Defendants and therefor does not initially preclude a claim of fraudulent inducement."[61]

Judge Goldberg also recently applied *SodexoMAGIC* to dismiss a fraudulent inducement claim on summary judgment.[62] The parties disputed a failed real estate deal governed by a contract containing an integration clause with fraud-insulating language:

> [a]ll prior understandings, agreements, representations and warranties, oral or written, between Seller and purchaser are merged in this contract; it completely expresses their full agreement and has been entered into after full investigation, *neither part[y] relying upon any statement made by anyone else that is not set forth in this contract.*[63]

Judge Goldberg concluded the language "neither part[y] relying upon any statement made by anyone else that is not set forth in this contract" constitutes fraud-insulating language and, applying *SodexoMAGIC*, concluded the claimant could not prove justifiable reliance on earlier representations and could not use extrinsic evidence to establish the parties' agreement omitted certain terms.[64]

We are guided by these recent opinions. K&G and Warfighter chose to include an integration clause in the Asset Transfer Agreement:

> Entire Agreement; Amendments. This Agreement, including the other Transaction Documents and all of the Schedules hereto, *contains the entire understanding of the Parties* and *supersedes all prior agreements and understandings* relating to the subject matter hereof. *No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each of the Parties.*[65]

K&G argues the integration clause in the Asset Transfer Agreement (section 6.5) does not contain fraud-insulating language and cannot be used to bar extrinsic evidence of fraud. K&G curiously concedes a nearly identical integration clause in its Independent Representative Procurement Agreement bars its fraud claim against Warfighter and agrees it should be dismissed.[66]

11

| Asset Transfer Agreement Section 6.5 | Independent Representative Procurement Agreement Section 10.08 |
|---|---|
| Entire Agreement; Amendments. This Agreement, including the other Transaction Documents and all of the Schedules hereto, **contains the entire understanding of the Parties and supersedes all prior agreements and understandings** relating to the subject matter hereof. No **amendment** of any provision of this Agreement shall be valid unless the same **shall be in writing** and **signed** by each of the Parties. | This Agreement **contains the entire understanding of the parties** with respect to the subject matter hereof **and supersedes all prior or contemporaneous representations**, warranties, agreements and understandings, and may not be **amended** nor may any provision hereof be waived **except in writing signed** by both parties. |

K&G does not adequately explain how identical language in the Asset Transfer Agreement does not bar its fraud claim but admittedly bars its fraud claim under the Independent Representative Procurement Agreement. It instead argues we must read the integration clause at section 6.5 together with the no-reliance clause of section 6.15 which it contends applies only to representations made by Lynn.

K&G contends the language of section 6.15 providing "*[e]xcept for those representations and warranties expressly set forth in Article II as made by [Lynn]*, each of K&G and [Warfighter] hereby disclaims reliance on any and all representations, warranties, or statements of any nature or kind, express or implied, including the accuracy or completeness of such representations, warranties or statements" and K&G and Warfighter "waiv[e] any and all claims ... arising from any alleged fraud, misrepresentation, omission, concealment ... *except for claims for a misrepresentation expressly made, or a breach of warranty expressly set forth in Article II*" only protects *Lynn* from fraud claims by Warfighter and K&G and *not* Warfighter and K&G from fraud claims against each other.[67] K&G reasons the introductory language of the no-reliance clause— "Except for those representations and warranties expressly set forth in Article II" made by Lynn— defines and limits the remaining language to mean Warfighter and K&G disclaim reliance on any

12

of Lynn's other representations and not the representations of each other. K&G argues we must import the limiting language of the no-reliance clause into the integration clause.

Even if we agreed with this tortured extension of the no-reliance clause, we do not agree it operates to limit the integration clause. The integration clause uses fraud-insulating language providing the Asset Transfer Agreement "contains the entire understanding of the Parties and supersedes all prior agreements and understandings" and cannot be amended without a writing signed by each party. The integration clause is not limited to Lynn's representations; the Asset Transfer Agreement supersedes all "prior agreements and understandings." The sophisticated business parties to the Asset Transfer Agreement—Lynn, Warfighter, and K&G—could have, but chose not to, include limiting language in the integration clause as they chose in the no-reliance provision.

We conclude the parties' chosen language in section 6.5 their Agreement "contains the entire understanding of the Parties and supersedes all prior agreements and understanding relating to the subject matter hereof" and any amendment "shall be in writing and signed by each of the Parties" constitutes fraud-insulating language under *SodexoMAGIC* and its progeny. We dismiss K&G's claim Warfighter fraudulently induced it to sign the Asset Transfer Agreement.

### B. Mr. Kem is not liable under a participation theory of liability.

K&G and Warfighter also chose to include an integration clause in section 10.08 of the Independent Representative Procurement Agreement:

> This Agreement ***contains the entire understanding of the parties*** with respect to the subject matter hereof and ***supersedes all prior or contemporaneous representations,*** warranties, agreements and understandings, and ***may not be amended nor may any provision hereof be waived except in writing signed by both parties.***[68]

K&G concedes section 10.08 constitutes fraud-insulating language barring its claim against Warfighter. But argues it can still proceed against Mr. Kem for fraud in the inducement of

13

the Independent Representative Procurement Agreement and the Asset Transfer Agreement under the "participation theory" of liability.

Corporate officers cannot be held personally liable for the torts allegedly committed by the corporation simply by virtue of their office under Pennsylvania law.[69] An officer may only be held personally liable where he "is an *actor* who participates in the wrongful acts," and not as the owner or officer.[70] The theory is different from a veil-piercing theory and "is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity."[71] "The participation theory of liability is not a cause of action in and of itself, but rather a form of derivative liability."[72] To sufficiently plead participation liability, K&G must allege (1) existence of tortious conduct; and (2) knowing participation in or personal direction of the tortious conduct by Mr. Kem.[73]

K&G seeks to impose fraud liability upon Mr. Kem for statements allegedly made to induce a contract with Warfighter. K&G is suing Warfighter in fraud for the same statements. K&G asks we impose personal liability upon a corporate agent as the salesperson for allegedly false representations to induce a contract. So K&G is asking we craft an exception to the effect of the agreed integration clause by suggesting Mr. Kem could be personally liable for the same statements Warfighter cannot be liable for. Accepting as true K&G's well-pleaded allegations and drawing all reasonable inferences in its favor, including allegations Mr. Kem misrepresented Warfighter's capacity to perform under the contracts, K&G's claims Mr. Kem fraudulently induced it to enter both the Asset Transfer Agreement and the Independent Representative Procurement Agreement fail. Both Agreements contain integration clauses providing their terms "contain[] the entire understanding of the parties" and "supersede[] all prior agreements and

understanding" or "prior or contemporaneous representations, warranties, agreements and understandings ..."

Integration clauses with this type of language are fraud-insulating under *SodexoMAGIC* and its progeny. K&G chose to include fraud-insulating language agreeing "all prior agreements and understandings" and "all prior or contemporaneous representations" are superseded by the Agreements. Even if Mr. Kem could be held liable under the participation theory on another deal, K&G included broad unambiguous language confirming their agreement the terms in the Agreements supersede all earlier understandings. It agreed there are no other representations. K&G's agreed language now insulates Mr. Kem from claims of fraudulent representation.

We dismiss K&G's claims against Mr. Kem for fraudulent inducement of the Asset Transfer Agreement and Independent Representative Procurement Agreement for the same reasons we dismiss claims against Warfighter for fraudulently inducing K&G to enter the Asset Transfer Agreement.[74]

### III. Conclusion

We dismiss K&G's fraudulent inducement claim against Warfighter and Mr. Kem. We will proceed on K&G's breach of contract claim against Warfighter and declaratory judgment.

---

[1] ECF No. 4, ¶ 5.

[2] *Id.* ¶ 6.

[3] *Id.* ¶ 7.

[4] *Id.*

[5] *Id.* ¶ 8. K&G does not plead where it filed this suit.

[6] *Id.* ¶ 9.

[7] *Id.* ¶¶ 12–13, 52–53.

[8] *Id.* ¶¶ 33, 54.

[9] *Id.* ¶ 55.

[10] *Id.* ¶¶ 55, 57.

[11] *Id.* ¶¶ 10–11, 18.

[12] *Id.* ¶ 12.

[13] *Id.* ¶ 13.

[14] *Id.*, Asset Transfer Agreement § 6.5 at 26 (using the pagination supplied by the ECF docketing system). Page references to the Asset Transfer Agreement and Independent Representative Procurement Agreement are to the pagination supplied by the ECF docketing system.

[15] *Id.*, Asset Transfer Agreement § 6.15, at 27. Article II of the Asset Transfer Agreement contains the representations and warranties made by Lynn to K&G and Warfighter. Under Article II, Lynn represents and warrants: (1) it is a valid organization in good standing to carry on its business; (2) it has the power to and authority to enter into the Asset Transfer Agreement; (3) no notices, reports or other filings are required to be made by Lynn with, nor any consents, registrations, approvals, permits, orders or authorizations required to be obtained by Lynn, from any governmental authority or person in connection with the Agreement; (4) non-contravention; (5) there are no legal actions pending to enjoin or otherwise delay the subject of the Agreement; (6) it has good and marketable title to the acquired assets, free and clear of liens; (7) each assumed contract is valid, binding, and enforceable against Lynn and is not in breach of any assumed contract; and (8) no broker or finder free is owing in connection with the Agreement. *Id.* at 19-20.

[16] *Id.* ¶¶ 11, 15.

[17] *Id.* ¶ 16.

[18] *Id.*

[19] *Id.* ¶ 16, n .2.

[20] *Id.*

[21] *Id.* ¶ 18.

[22] *Id.*, Independent Representative Procurement Agreement, ¶ 10.08 at 52.

[23] *Id.* ¶ 21.

[24] *Id.* ¶ 22.

[25] *Id.* ¶ 20.

[26] *Id.* ¶ 23.

[27] *Id.* ¶ 24.

[28] *Id.* ¶ 25.

[29] *Id.* ¶¶ 26–29.

[30] *Id.* ¶¶ 31–33, 52–59.

[31] *Id.*

[32] *Id.*, Wherefore Clause, ¶¶ A–C.

[33] ECF No. 23. Warfighter does not move to dismiss the breach of contract claims or the declaratory judgment. We apply the familiar standard to Defendants' partial motion to dismiss. A complaint must state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The purpose of Rule 12(b)(6) is to test the sufficiency of the factual allegations in a complaint. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Klotz v. Celentano Stadtmauer and Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility ... a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a Rule 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert*

*W. Mauthe, M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that … 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations … and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[34] ECF No. 27 at 2.

[35] *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 205 (3d Cir. 2022).

[36] *Id.* at 206. Fraud in the execution is a claim alleging a party's mistake as to the terms and actual contents of the agreement it executed due to the other party's fraud. *Id.* (quoting *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 206 (Pa. 2007)).

[37] *Id.* at 213 (citing *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 424, 436–37 (Pa. 2004)).

[38] *Id.* at 213.

[39] *Id.* (quoting *Yocca*, 854 A.2d at 436–37).

[40] *Id.*

[41] *Id.* at 213, n. 5 (citing *Yocca*, 854 A.2d at 437).

[42] *Id.* at 213.

[43] *Id.* at 213–14.

[44] *Id.* at 214 (collecting cases).

[45] *Id.* (collecting cases).

[46] *Id.* at 215 (emphasis added by the court).

[47] *Id.* at 202–05.

[48] *Id.* at 215.

[49] *Id.*

[50] *Id.* at 216.

[51] No. 22-1005, 2023 WL 4758449, at *1 (3d Cir. July 26, 2023) (emphasis added).

[52] *Id.* at *5–*6.

[53] *Id.* at *6.

[54] Nos. 22-3031, 22-3087, 2023 WL 4785511, at *3–*4 (3d Cir. July 27, 2023) (emphasis added).

[55] *Id.* at *3.

[56] No. 22-1565, 2023 WL 2505538 (E.D. Pa. Mar. 14, 2023).

[57] *Id.* at *28 (emphasis added).

[58] *Id.*

[59] *Id.*

[60] *Id.* at *29.

[61] *Id.* Judge Slomsky ultimately found the fraudulent inducement claims failed for other reasons.

[62] *Foster v. Attias*, Nos. 18-4853, 19-866, 2023 WL 3435463 (E.D. Pa. May 12, 2023).

[63] *Id.* at *14 (emphasis added).

[64] *Id.*

[65] ECF No. 4 at 26, ¶ 6.5 (emphasis added).

[66] ECF No. 27 at 10, n.1.

[67] ECF No. 27 at 5.

[68] ECF No. 4 at 52 (ECF pagination), ¶ 10.08.

[69] *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 89–90 (Pa. 1983).

[70] *Id.* at 90 (emphasis added).

[71] *18 KT.TV, LLC v. Entest Biomedical, Inc.*, No. 11-244, 2011 WL 5374515, at *7 (M.D. Pa. Nov. 7, 2011) (quoting *Wicks*, 470 A.2d at 90.

---

[72] *In re Eastern Continuous Forms, Inc.*, 302 B.R. 320, 343 (E.D. Pa. 2003); *see also In re Grejda*, Nos. 06-476, 06-522, 2007 WL 2792908, at *11 (W.D. Pa. Sept. 21, 2007) (the participation theory imposes liability "arising from some other wrongful act and cannot be used to create liability where it does not otherwise exist.").

[73] *Foster*, 2020 WL 5439360, at *6 (quoting *Streamline Bus. Grp., LLC v. Vidible, Inc.*, No. 14-1433, 2016 WL 3523033, at *4 (E.D. Pa. June 27, 2016)).

[74] We need not address Warfighter's arguments the gist of the action doctrine bars the fraudulent inducement claim and a failure to state a claim for fraud based on post-agreement developments.